950 So.2d 570 (2007)
In re Robert J. SHORTESS, Jr.
No. 2006-B-1580.
Supreme Court of Louisiana.
January 17, 2007.
Rehearing Denied March 30, 2007.
*571 Charles B. Plattsmier, Baton Rouge, for Applicant.
Harley M. Brown, Baton Rouge, Robert J. Shortess, Jr., for Respondent.

ATTORNEY DISCIPLINARY PROCEEDINGS
PER CURIAM.
This disciplinary matter arises from formal charges filed by the Office of Disciplinary Counsel ("ODC") against the respondent, Robert J. Shortess, Jr., an attorney licensed to practice law in Louisiana but currently on interim suspension pursuant to a joint motion of the parties filed in July 2001. In re: Shortess, 01-1956 (La.7/6/01), 791 So.2d 631. For the reasons that follow, we now permanently disbar respondent.

FORMAL CHARGES[1]

Count I
In September 1998, respondent accepted employment with the Baton Rouge law firm of Sweeney & Miller, L.L.C. ("Sweeney & Miller").[2] This arrangement did not end amicably. When respondent left the firm on October 3, 2000, he took with him the files of certain personal injury clients who had signed contingent fee agreements with Sweeney & Miller.[3] Respondent forged the endorsements of these clients and/or the endorsement of Sweeney & Miller on settlement checks and converted the funds to his own use. The ODC alleged that all told, respondent converted approximately $150,000 in funds belonging to clients, the law firm, and third parties.
The ODC alleged that respondent's conduct in this matter violated Rules 1.15(a) *572 (a lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property), 1.15(b) (upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person; shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive; and upon request by the client or third person, shall promptly render a full accounting regarding such property), and 8.4(c) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation) of the Rules of Professional Conduct.
In his answer to the formal charges, respondent denied any misconduct relating to Count I. He suggested that his relationship with Sweeney & Miller ended badly, as a result of which "allegations were made, and some clients were misinformed regarding some of these matters." In a supplemental filing, respondent asserted that the client files he took with him when he left Sweeney & Miller were those he considered to be "his" files, including the cases he handled as the "primary attorney."

Count II
In August 1998, Ronald Boudreaux retained respondent to represent him in a personal injury matter. The ODC alleged that when the case proceeded to trial in the Baton Rouge City Court, respondent was poorly prepared and failed to introduce certain evidence, resulting in a low recovery for Mr. Boudreaux. Respondent then promised to file an appeal, but never did so and failed to advise his client of his inaction. Respondent also collected costs and expenses from his client in advance but never paid most of the costs; as a result, Mr. Boudreaux was required to pay the costs a second time.
The ODC alleged that respondent's conduct violated Rules 1.3 (failure to act with reasonable diligence and promptness in representing a client), 1.4 (failure to communicate with a client), and 8.4(c) of the Rules of Professional Conduct.
In his answer to the formal charges, respondent denied any misconduct relating to Count II. He claimed that he was well prepared for the trial of Mr. Boudreaux's case and had been complimented on his performance by the trial judge. Respondent further stated that Mr. Boudreaux was dissatisfied with the amount of the damage award and inquired about an appeal, which respondent did not think would be successful but which he informed Mr. Boudreaux would require an advance deposit for costs. Respondent asserted that by the time Mr. Boudreaux made a decision to go forward with the appeal, the legal delays for doing so had elapsed, whereupon Mr. Boudreaux was informed that it was too late to appeal.

Count III
In December 1999, Cher Minor retained respondent to represent her in a personal injury matter. In July 2000, respondent settled Ms. Minor's claim for $3,500 without her knowledge or consent and converted the settlement proceeds.
The ODC alleged that respondent's conduct violated Rules 1.8(k) (a lawyer shall not solicit or obtain a client's prospective consent to enter into a binding settlement agreement or to execute settlement or release documents on behalf of the client), 1.15(a), and 8.4(c) of the Rules of Professional Conduct.
In his answer to the formal charges, respondent acknowledged that he "acted inappropriately regarding Ms. Minor's *573 case,"[4] but he denied that he converted any funds due Ms. Minor. Rather, respondent contended that Ms. Minor owed him an outstanding legal fee in connection with a prior representation involving a life insurance claim.

Count IV
In 2001, Michael Rome and Ada Irene Rome paid respondent $400 to file a bankruptcy proceeding, the primary purpose of which was to save their home from foreclosure. However, respondent failed to timely file the bankruptcy pleadings, and when he finally did so, the pleadings contained the false representation that the Romes had not paid him a legal fee. These pleadings were prepared by a non-lawyer assistant who was not adequately supervised by respondent. As a result of respondent's mishandling of the bankruptcy matter, Mr. and Mrs. Rome lost their home.
The ODC alleged that respondent's conduct violated Rules 1.3, 1.4, 3.3(a)(1) (a lawyer shall not knowingly make a false statement of material fact or law to a tribunal), and 5.3(c)(1) (responsibilities regarding non-lawyer assistants) of the Rules of Professional Conduct.
In his answer to the formal charges, respondent acknowledged his "role and responsibility regarding this matter." Respondent also noted that he had been sanctioned by the bankruptcy judge,[5] and furthermore, that he had confessed judgment in favor of Mr. and Mrs. Rome in the amount of $4,000.

Count VI
In September 2000, Eric Cox paid respondent $750 to defend him in a pending civil suit and to file a reconventional demand. Respondent answered the petition on Mr. Cox's behalf but did not file the reconventional demand. Thereafter, Mr. Cox could not reach respondent to obtain his file, nor did Mr. Cox obtain a refund or accounting of the fee he paid to respondent.
The ODC alleged that respondent's conduct violated Rules 1.3, 1.4, and 1.16(d) (obligations upon termination of the representation) of the Rules of Professional Conduct.
In his answer to the formal charges, respondent denied any misconduct relating to Count VI. Respondent asserted that he did not file a reconventional demand on Mr. Cox's behalf because he did not believe such a claim was well founded. He further asserted that he informed Mr. Cox of his opinion in this regard. Respondent stated that he worked on the case for approximately ten hours until he was placed on interim suspension; at that time he referred the matter to another attorney, who told respondent that she would represent Mr. Cox. However, Mr. Cox never paid the attorney the retainer fee she requested. Respondent was unaware of this fact until he received a telephone call from Mr. Cox a year later, demanding the refund of the $750 fee he paid to respondent in 2000.

*574 Hearing Committee Recommendation

Based on the evidence presented at the three-day hearing in this matter, the hearing committee made the following findings:
Count I: The committee found that respondent took certain client files with him in connection with his departure from Sweeney & Miller on October 3, 2000, including the files of the fourteen clients specified in the formal charges. Mr. Sweeney and Mr. Miller told respondent that the files and clients were not his and belonged to the firm. Respondent disagreed, contending that the files and clients were his, as he had performed most, if not all, of the work associated with the representation of each client. Respondent also felt justified in taking the files and clients because he had brought a number of files and clients with him when he was hired by Sweeney & Miller. Nevertheless, most, if not all, of the clients in question retained the services of Sweeney & Miller in response to either referrals and/or advertising and hired the law firm, as opposed to respondent individually. Furthermore, there was no type of exit agreement regarding respondent's taking of any files or clients, nor was there any type of agreement regarding the sharing of any fees that would be generated by the files or clients that respondent kept.[6] Respondent simply took the files and only informed Mr. Sweeney and Mr. Miller when they confronted him.
Additionally, Sweeney & Miller had incurred and paid court costs, medical bills, and other expenses in connection with the representation of the particular clients. There were no discussions or agreements in place as to how Sweeney & Miller would be compensated for these costs and expenses. Sweeney & Miller had also guaranteed payments of future expenses to the healthcare providers treating the clients whose files had been taken by respondent. Both Mr. Sweeney and Mr. Miller made it clear that after taking these files and clients, respondent settled the various cases and did not reimburse Sweeney & Miller for the costs that had been advanced, nor did respondent pay the outstanding bills to healthcare providers who treated the various clients. Sweeney & Miller was called upon by various healthcare providers to pay these bills, despite the fact that respondent had settled the claims.[7]
The committee found it significant that several of the settlement checks for the clients in question were dated well before respondent's departure from Sweeney & Miller. Some of these settlement checks appeared to have been deposited into respondent's own trust account prior to his departure from Sweeney & Miller. The committee observed that these actions by respondent were "concerted and premeditated." The pre-termination settlements were in cases that respondent handled as an attorney with Sweeney & Miller, and yet he deposited 100% of the settlement proceeds into his own trust account, depriving Sweeney & Miller of any fees to which it may have been entitled. He further failed to reimburse Sweeney & *575 Miller for any costs incurred or advanced in connection with the firm's representation of those clients.
Shortly after respondent departed Sweeney & Miller, and when it became evident that respondent would not return the files to the firm, the firm instituted litigation against respondent in state district court. In addition to other relief, Sweeney & Miller sought injunctive relief against respondent, seeking the return of their files and an accounting of all proceeds received in connection with respondent's handling of the cases. Shortly thereafter, respondent and his wife filed for bankruptcy relief and the Sweeney & Miller claim was removed as a core proceeding in respondent's bankruptcy proceeding. As of the date of the disciplinary hearing, no accounting had been provided to Sweeney & Miller on any of the cases.
Respondent gave a two-day deposition as part of the bankruptcy proceeding. After the first day, a settlement agreement was reached between respondent and Sweeney & Miller. Respondent's level of cooperation changed dramatically on the second day of the deposition. In his testimony before the committee, respondent explained that the change in attitude was due to his settlement agreement with Sweeney & Miller. A review of the deposition transcripts, which were introduced into evidence, established that, on the first day of the deposition, respondent for the most part denied any wrongdoing. However, on the second day of the deposition, respondent admitted to forging the endorsements of several clients on a number of settlement checks, among other misconduct. Respondent now claims that the testimony he gave on the second day of the deposition was perjured and that he lied under oath in an attempt to pacify Sweeney & Miller. Considering respondent's admission of perjury, the committee found it "quite astounding" that he would so viciously attack the credibility of Sweeney & Miller, particularly Mr. Sweeney, as he has done throughout these proceedings.
As part of the bankruptcy proceeding, Sweeney & Miller filed an exception to respondent's discharge, claiming that respondent illegally took Sweeney & Miller's clients, files, and other property and that respondent settled a number of claims of these former clients and unlawfully converted the settlement proceeds to his own use, all to the detriment of Sweeney & Miller. Twelve days after the conclusion of respondent's deposition, the bankruptcy court executed a consent judgment in favor of Sweeney & Miller and against respondent in the amount of $150,000. The consent judgment provided that this debt was non-dischargeable pursuant to applicable provisions of the Bankruptcy Code. Respondent agreed to the terms of the consent judgment.
Based on these factual findings, and considering that respondent's credibility is "seriously lacking," the committee found clear and convincing evidence that respondent (1) took, without permission, the Sweeney & Miller client files at issue in Count I of the formal charges; (2) unlawfully and without permission endorsed the names of clients and Sweeney & Miller on the backs of the settlement checks; and (3) failed to protect the interests of third parties by failing to satisfy the clients' outstanding medical bills and costs out of the settlement proceeds. In entering into the non-dischargeable consent judgment, respondent admitted that he wrongfully converted these settlement funds to his own use. All of this conduct involved respondent's dishonesty, fraud, deceit, and misrepresentation. Accordingly, the committee found that respondent violated the Rules of Professional Conduct as alleged in Count I.
*576 Count II: The committee found that Ronald Boudreaux retained respondent to represent him in civil litigation resulting from a battery in which Mr. Boudreaux was the victim. Respondent filed a petition for damages on Mr. Boudreaux's behalf in the Baton Rouge City Court on August 28, 1998. Following discovery, the matter was bifurcated for trial purposes. On July 8, 1999, after hearing the evidence regarding liability, Judge Etta Kay Hearn ruled that the defendant was liable to Mr. Boudreaux for his injuries. The damages phase of the trial was conducted on July 27, 1999, after which Judge Hearn ruled that Mr. Boudreaux was entitled to general damages in the amount of $4,000 and special damages totaling $693.29. In her testimony at the formal hearing, Judge Hearn stated that she did not recall whether she had declined to admit evidence of certain medical expenses offered by respondent. She testified that she rendered her ruling based on the evidence presented by both parties.
Shortly after the judgment was rendered, Mr. Boudreaux instructed respondent to appeal Judge Hearn's decision. Mr. Boudreaux made several telephone calls to respondent over the next ten months regarding the status of his case, but he was never able to speak with respondent, nor would respondent return the telephone calls. When Mr. Boudreaux finally spoke to respondent, respondent informed him, for the first time, that he did not perfect the appeal, as Mr. Boudreaux had requested, and that he could no longer find Mr. Boudreaux's file.
Thereafter, Mr. Boudreaux spoke to Mr. Sweeney, who investigated the matter and confirmed that no appeal had been perfected. At the hearing in this matter, Mr. Sweeney identified his office's ledger sheet for the Boudreaux file, which indicated that the firm incurred $1,129.83 in expenses. Also at the hearing, respondent introduced copies of three checks received from Mr. Boudreaux, along with receipts, indicating that Mr. Boudreaux paid a total of $1,100 in advanced expenses, which is consistent with Mr. Boudreaux's testimony. The first check is dated August 10, 1998, approximately three weeks before respondent commenced his affiliation with Sweeney & Miller. Most of the discovery and the trial occurred while respondent was affiliated with Sweeney & Miller. The efforts by Mr. Boudreaux to contact respondent regarding his appeal were after respondent's affiliation with Sweeney & Miller had ended.
No evidence was presented regarding an accounting of the advanced costs paid by Mr. Boudreaux, other than Sweeney & Miller's ledger sheet, which does not include the first check given to respondent prior to his affiliation with Sweeney & Miller. Respondent did suggest that certain funds on deposit in his trust account were transferred into the trust account of Sweeney & Miller, but no accounting has been presented to establish what happened to Mr. Boudreaux's funds, other than Sweeney & Miller's ledger sheet, which was limited to funds received and expenses incurred after respondent joined Sweeney & Miller.
Based on these factual findings, the committee determined that respondent did not neglect Mr. Boudreaux's legal matter at the trial level, as alleged in the formal charges. The record of the trial court proceeding establishes that respondent propounded discovery upon his opponent, filed a motion to compel, and appeared to be representing his client's best interest. Furthermore, Judge Hearn testified that she thought both attorneys did a very good job at trial and that respondent appeared adequately prepared. Nevertheless, the inquiry does not end there, as respondent *577 is also charged with failing to perfect an appeal as instructed by Mr. Boudreaux, failing to keep him informed, and engaging in dishonest conduct. The committee found those charges were proven by clear and convincing evidence.
Mr. Boudreaux made it clear that he instructed respondent to appeal the trial court's judgment. Respondent denied being instructed to appeal but did admit to discussing an appeal with Mr. Boudreaux and recommending against appealing the judgment. Mr. Boudreaux ultimately contacted Mr. Sweeney for assistance and learned that the appeal had not been perfected.
Mr. Boudreaux also made it clear that he attempted to contact respondent for a period of ten months after he and respondent discussed his rights to appeal, to no avail. When he was finally able to contact respondent, respondent informed him, for the first time, that he did not perfect the appeal and could no longer find the file. Respondent presented no correspondence or other evidence indicating any communication between himself and Mr. Boudreaux during this period of time and Mr. Boudreaux testified that he had to obtain a copy of the judgment in his trial from Mr. Sweeney. With this in mind, the committee found clear and convincing evidence has been presented to establish that respondent failed to keep Mr. Boudreaux informed of the status of his case and that he failed to appeal the trial court's judgment, despite Mr. Boudreaux's clear instruction in that regard, all in violation of Rule 1.4.
The committee also noted that $400 of Mr. Boudreaux's advanced costs appears to be missing. Mr. Boudreaux paid respondent $400 prior to his affiliation with Sweeney & Miller, and subsequently made payments of $400 and $300 during respondent's affiliation with Sweeney & Miller. The last two payments are reflected on Sweeney & Miller's ledger account, but respondent has failed to account for the initial $400 payment. Not only did respondent not account for the payment to Sweeney & Miller, he failed to provide Mr. Boudreaux with any accounting for the funds he paid. It was only after Mr. Boudreaux angrily confronted Mr. Sweeney, after unsuccessfully attempting to obtain answers from respondent, that Mr. Boudreaux received an accounting of the funds paid to Sweeney & Miller. Respondent had no explanation for this and provided no accounting for these funds at the hearing. Having failed to account for his client's funds, the committee found that respondent also violated Rule 8.4(c).
Count III: The committee found that Cher Minor retained respondent to represent her in a personal injury matter stemming from an automobile accident. Respondent settled Ms. Minor's personal injury claim without her knowledge or permission, and he endorsed Ms. Minor's signature on the settlement check, also without her permission. Ms. Minor testified that she did not receive any of the settlement proceeds and did not know who paid her medical bills.
Respondent stipulated at the hearing that he committed the rule violations alleged in Count III of the formal charges.
Count IV: The committee found that Michael Rome and his wife retained respondent to handle their bankruptcy. The Romes were behind on their mortgage note but wanted to save their house, which respondent told them they would be able to do in a Chapter 13 proceeding. Respondent admitted that he mishandled the bankruptcy filings, and as a result, the Romes ultimately lost their house. The stress of this ordeal has affected Mrs. Rome's health, and she has been diagnosed with depression. Furthermore, the Romes *578 had to hire another attorney to complete the bankruptcy.
Bankruptcy Judge Louis Phillips presided over the Romes' bankruptcy proceeding. He testified that the creditor holding the mortgage on the Romes' residence filed a motion to lift the automatic bankruptcy stay and that respondent did not file any opposition whatsoever. The Romes eventually appeared in Judge Phillips' court one day, without counsel, and asked him for help. Judge Phillips investigated the matter and uncovered false disclosures in the bankruptcy filings prepared by respondent. Judge Phillips made it clear that, if respondent had filed the proper type of bankruptcy proceeding in a timely fashion, the foreclosure process could have been stopped and the Romes could have kept their home.
Respondent stipulated at the hearing that he committed the rule violations alleged in Count IV of the formal charges.
Count VI: The committee found that Eric Cox retained respondent on September 27, 2000 (shortly before respondent's departure from Sweeney & Miller) to represent him in a civil suit. On the same date, Mr. Cox paid respondent a retainer fee of $750. Respondent was to be paid hourly for his work, although he and Mr. Cox disagreed as to the amount of the hourly rate.
The defendant in the civil litigation, Michelle Mansur, rented residential property from Mr. Cox but decided to move out of the residence before the expiration of her lease agreement. Mr. Cox confronted Ms. Mansur as she was in the process of moving and shot at her vehicle several times with a pistol. As a result of this incident, Ms. Mansur sued Mr. Cox for personal injury damages. Mr. Cox retained respondent to defend the lawsuit and specifically requested that respondent file a reconventional demand for unpaid rent for the remaining term of Ms. Mansur's lease and for alleged property damage caused by Ms. Mansur. Respondent filed an answer in the form of a general denial of the allegations set forth in Ms. Mansur's petition, but he did not file a reconventional demand, as requested by Mr. Cox. Respondent testified that under the circumstances he felt a reconventional demand would have been frivolous.
Over the next several months, Mr. Cox communicated with respondent on several occasions and was under the impression that the case was "moving along;" however, in July 2001, respondent was placed on interim suspension. Respondent did not notify Mr. Cox of his suspension and Mr. Cox learned of the suspension from someone else.
After respondent's interim suspension, attorney Tammy Weaver moved her law practice into respondent's office space and commenced using respondent's telephone number as her own. The court scheduled a status conference in the Mansur civil matter and called respondent's telephone number, as he was counsel of record for Mr. Cox. Since respondent was no longer practicing law and since Ms. Weaver was using respondent's telephone number, Ms. Weaver was asked by the court to provide notice to Mr. Cox of the status conference. Ms. Weaver forwarded a letter to Mr. Cox advising him of the status conference and offering her assistance, but Mr. Cox never followed up. Additionally, Ms. Weaver spoke to Mr. Cox's wife by telephone and briefly discussed the case with her. Ms. Weaver did not assume the representation of Mr. Cox.
At some point, attorney Brandon Brown enrolled as counsel for Mr. Cox and filed a reconventional demand on Mr. Cox's behalf. The matter proceeded to trial, and after hearing the evidence, the trial court *579 ruled in favor of Ms. Mansur and against Mr. Cox. The court awarded Ms. Mansur damages and dismissed Mr. Cox's reconventional demand. There was no request by Ms. Mansur's counsel or anyone else for any type of sanctions regarding the alleged frivolous nature of the reconventional demand, nor was any evidence presented to the committee that the trial judge or anyone else felt that the reconventional demand was frivolous. Subsequently, Mr. Brown perfected an appeal on Mr. Cox's behalf, following which the trial court's judgment was affirmed. See Mansur v. Cox, 04-0140 (La.App. 1st Cir.12/30/04), 898 So.2d 446.
Based on these factual findings, the committee determined that respondent neglected Mr. Cox's legal matter in failing to file the reconventional demand and in failing to inform Mr. Cox of this fact. The committee did not agree with respondent's position that the reconventional demand was frivolous and, moreover, did not believe respondent's uncorroborated testimony that he told Mr. Cox he would not file the reconventional demand.
The committee also found that respondent did not keep Mr. Cox adequately informed of the status of his case. Mr. Cox admitted that he had approximately four conversations with respondent about his case over the initial few months of the representation. However, respondent, by his own admission, never informed Mr. Cox of his interim suspension in July 2001 and never informed him that he had not filed the reconventional demand. After his suspension, respondent left Mr. Cox's file in his office, along with several other client files, and assumed that Ms. Weaver would take over Mr. Cox's representation. Respondent never discussed this with Ms. Weaver or with Mr. Cox, and he clearly failed to protect Mr. Cox's interests at the conclusion of his representation. Furthermore, there is no dispute that respondent failed to provide Mr. Cox with an accounting of his $750 retainer fee.
The committee found that, in his actions as set forth above, respondent violated duties owed to his clients, the public, the legal system, and the profession. He acted intentionally in unlawfully endorsing the names of his clients and Sweeney & Miller on a number of settlement checks and in converting the funds to his own use (Count I). He was also "extremely negligent and careless" in his representation of Mr. Boudreaux (Count II), Michael and Ada Rome (Count IV), and Eric Cox (Count VI). He ignored Mr. Boudreaux's instructions to appeal an adverse judgment and likewise ignored Mr. Cox's instructions to file a reconventional demand. These actions and inactions caused significant harm to respondent's clients and to Sweeney & Miller. Some of respondent's clients were never compensated for their injuries, some of his clients never received an accounting for fees they paid, and his clients did not receive meaningful legal representation. Respondent entered into a consent judgment in favor of Sweeney & Miller in the amount of $150,000 and stipulated that the judgment was not dischargeable under the bankruptcy rules, presumably because the judgment was a result of respondent's continued misrepresentations, fraud, and misappropriation of funds due Sweeney & Miller. Under the ABA's Standards for Imposing Lawyer Sanctions, the baseline sanction for respondent's misconduct is disbarment.
As aggravating factors, the committee recognized the following: a dishonest or selfish motive, a pattern of misconduct, multiple offenses, indifference to making restitution, illegal conduct, and "extreme damage to the legal profession." With regard to mitigating factors, the committee stated:

*580 Factors in mitigation include personal or emotional problems, as well as potential mental disability for which he sought treatment. Additionally, although it is questionable whether they are factors in mitigation, the Committee has considered the additional mitigation factors asserted by Respondent that he is a commended Veteran of the Armed Forces and is an active coach of YMCA youth programs.
The committee concluded:
The Committee notes Respondent's vicious attacks on Mr. Sweeney throughout the extent of these proceedings, both at the hearing and in various pre-hearing motions and conferences. Additionally, although Respondent cooperated with ODC by providing a sworn statement, he has levied allegations against ODC that, in the Committee's opinion, are completely unwarranted. These factors, along with Respondent's continued denial of any wrongdoing in Counts I, II and VI, lead the Committee to believe that Respondent wishes to place blame for his actions anywhere but on his own shoulders.
Noting prior cases in which this court has imposed permanent disbarment for misconduct less egregious than respondent's, and considering respondent's lack of remorse and failure to make restitution to his innocent victims, the committee recommended that respondent be permanently disbarred. The committee further recommended that respondent be ordered to make full restitution to Sweeney & Miller in the amount of the consent judgment, as well as to the specific clients whose settlement proceeds were illegally converted by respondent to his own use.
Respondent filed an objection to the hearing committee's report and recommendation.

Disciplinary Board Recommendation
The disciplinary board accepted the hearing committee's factual findings and agreed that the committee properly applied the Rules of Professional Conduct. Respondent intentionally violated duties owed to his clients, the public, and the profession. He caused actual harm by purposely engaging in a pattern of activities wherein he converted at least fourteen clients' settlement funds and an unknown number of fees owed to third-party providers. Without authorization, respondent endorsed client names and the Sweeney & Miller name to checks and never accounted for the funds. Respondent's conduct involved forgery, deceit, and misrepresentation, which are against duties owed to the public to abide by the law. The trust that a client places in the legal profession for help and representation has been undermined by respondent's conversion of money and neglect of cases. Respondent's decision to break the law and the Rules of Professional Conduct undermines the public's trust in lawyers as those who work with the law and not outside of it.
In mitigation, the board acknowledged that respondent has no prior disciplinary record.[8] As aggravating factors, the board recognized respondent's dishonest or selfish motive, a pattern of misconduct, multiple *581 offenses, refusal to acknowledge the wrongful nature of the conduct, indifference to making restitution, and illegal conduct.
The board determined that the baseline sanction for respondent's misconduct is disbarment. However, the ODC has suggested, and the committee recommended, that respondent be permanently disbarred for his violation of Guideline 1 of the permanent disbarment guidelines (repeated or multiple instances of intentional conversion of client funds with substantial harm). The board agreed with this finding, noting that respondent intentionally converted the funds of fourteen clients. Respondent also converted funds belonging to an unknown number of third-party providers. By sheer volume alone, respondent has harmed more clients and third parties than the respondent in In re: Condoll, 01-3106 (La.1/24/03), 840 So.2d 502, who was permanently disbarred for depriving clients of their settlement funds and failing to refund unearned fees.
Under these circumstances, the board concluded that permanent disbarment is justified. Accordingly, the board recommended that respondent be permanently disbarred. The board further recommended that respondent be ordered to provide an accounting to the clients named in the formal charges, pay restitution to the clients and third parties affected by his conduct, and be assessed with all costs and expenses of these proceedings.[9]
Respondent filed an objection to the disciplinary board's recommendation. Accordingly, the case was docketed for oral argument pursuant to Supreme Court Rule XIX, § 11(G)(1)(b).

DISCUSSION
Bar disciplinary matters fall within the original jurisdiction of this court. La. Const. art. V, § 5(B). Consequently, we act as triers of fact and conduct an independent review of the record to determine whether the alleged misconduct has been proven by clear and convincing evidence. In re: Quaid, 94-1316 (La.11/30/94), 646 So.2d 343; Louisiana State Bar Ass'n v. Boutall, 597 So.2d 444 (La.1992). While we are not bound in any way by the findings and recommendations of the hearing committee and disciplinary board, we have held the manifest error standard is applicable to the committee's factual findings. See In re: Caulfield, 96-1401 (La.11/25/96), 683 So.2d 714; In re: Pardue, 93-2865 (La.3/11/94), 633 So.2d 150.
Based on our review, we conclude the hearing committee's factual findings are supported by the record. The evidence produced by the ODC establishes in a clear and convincing manner that respondent committed several acts of professional misconduct, the most serious of which is conversion of funds belonging to at least fourteen clients as well as an unknown number of third parties. Respondent's actions violated numerous provisions of the Rules of Professional Conduct, including Rules 1.15 and 8.4.
Having found evidence of professional misconduct, we now turn to a determination of the appropriate sanction for respondent's actions. In determining a sanction, we are mindful that disciplinary proceedings are designed to maintain high standards of conduct, protect the public, preserve the integrity of the profession, and deter future misconduct. Louisiana State Bar Ass'n v. Reis, 513 So.2d 1173 *582 (La.1987). The discipline to be imposed depends upon the facts of each case and the seriousness of the offenses involved considered in light of any aggravating and mitigating circumstances. Louisiana State Bar Ass'n v. Whittington, 459 So.2d 520 (La.1984).
In Louisiana State Bar Ass'n v. Hinrichs, 486 So.2d 116 (La.1986), we conducted an extensive review of the jurisprudence in conversion cases in order to determine the appropriate sanctions for different types of conversion. We reserved disbarment, then the most serious sanction available, for conversion cases in which one or more of the following elements are present:
the lawyer acts in bad faith and intends a result inconsistent with his client's interest; the lawyer commits forgery or other fraudulent acts in connection with the violation; the magnitude or the duration of the deprivation is extensive; the magnitude of the damage or risk of damage, expense and inconvenience caused the client is great; the lawyer either fails to make full restitution or does so tardily after extended pressure of disciplinary or legal proceedings.
The record supports a finding of nearly all of these elements in the instant case. Respondent's actions were clearly undertaken in bad faith and were contrary to his clients' interests. He committed fraudulent acts in connection with the conversion. His actions caused significant harm to his clients and third parties. Without question, the baseline sanction for respondent's misconduct is disbarment.
However, this finding does not end our inquiry. In the years following Hinrichs, we have recognized that certain types of misconduct are so repugnant to the standards of the legal profession that lawyers who engage in such actions should be permanently prohibited from practicing law. In Appendix E to Supreme Court Rule XIX, we set forth guidelines illustrating the types of conduct that might warrant such permanent disbarment. Pertinent to this case is Guideline 1, which suggests that permanent disbarment is appropriate for "repeated or multiple instances of intentional conversion of client funds with substantial harm."
We do not lightly impose the sanction of permanent disbarment. In re: Gros, 03-3076 (La.4/23/04), 871 So.2d 1091; In re: Morphis, 01-2803 (La.12/4/02), 831 So.2d 934. Nonetheless, we are firmly convinced that we would be remiss in our constitutional duty to regulate the practice of law if we did not impose that sanction here. As recognized by both the hearing committee and the disciplinary board, there are at least fourteen instances of conversion in this case, and possibly many more. Respondent's actions, which included forgery, deceit and misrepresentation, caused actual and substantial harm to his clients and third parties. Respondent's actions convincingly demonstrate that he does not possess the requisite moral fitness to practice law in this state. He must be permanently disbarred.[10]

*583 DECREE
Upon review of the findings and recommendations of the hearing committee and disciplinary board, and considering the record, briefs, and oral argument, it is ordered that the name of Robert Joseph Shortess, Jr., Louisiana Bar Roll No. 22618, be stricken from the roll of attorneys and that his license to practice law in the State of Louisiana be revoked. Pursuant to Supreme Court Rule XIX, § 24(A), it is further ordered that respondent be permanently prohibited from being readmitted to the practice of law in this state. Respondent is ordered to make restitution to his victims and to repay to the Louisiana State Bar Association's Client Assistance Fund any amounts paid to claimants on his behalf. All costs and expenses in the matter are assessed against respondent in accordance with Supreme Court Rule XIX, § 10.1, with legal interest to commence thirty days from the date of finality of this court's judgment until paid.
NOTES
[1] In the formal charges filed by the ODC on July 28, 2003, respondent was originally charged with a total of six counts of misconduct. However, during the hearing in this matter, Count V was dismissed in its entirety by the ODC. Accordingly, no reference is made in this opinion to Count V. Furthermore, in Counts II and IV, respondent was originally charged with failing to cooperate with the ODC in its investigation. The failure to cooperate charges were also dismissed by the ODC during the hearing, and no reference will be made to them herein.
[2] There is no written agreement describing the nature of respondent's position with the firm, and respondent, Neil Sweeney, and Ken Miller disagree whether he was hired as an associate, independent contractor, or "junior" partner. The hearing committee acknowledged this issue but determined that it is largely irrelevant for purposes of resolving the formal charges.
[3] Fourteen clients are specifically identified in the formal charges: Cher Minor, Jackie Arnold, Melissa Cron, Toni Chauvin, Carissa Raby, Ricky Patin, Carlton Davis, Joan Lee, Michael Morris, Lloyd Dyer, Carl Nailing, Barbara Rineheart, Nancy Rineheart, and Aubrey Carroll.
[4] At the formal hearing, respondent's counsel stipulated that respondent endorsed Ms. Minor's signature on the back of the settlement check and that he did not have her permission to do so. Furthermore, in his own testimony, respondent admitted that he settled Ms. Minor's personal injury claim without her knowledge or consent.
[5] Respondent was ordered to repay Mr. and Mrs. Rome a $200 bankruptcy filing fee, plus a sanction of $237.60, representing the wages lost by Mr. Rome in attending two hearings in the bankruptcy court, for a total of $437.60.
[6] Both Mr. Sweeney and Mr. Miller testified that they received no compensation from any of the settlements, despite the fact that the clients clearly signed Sweeney & Miller retainer agreements.
[7] Respondent testified that he forwarded various checks regarding these files to Mr. Miller. However, no corroborating evidence was presented to substantiate this allegation. Based on the testimony of Mr. Sweeney and Mr. Miller, the committee concluded that no such payments were ever made. Sweeney & Miller ultimately paid a number of these expenses without ever receiving a fee for their services or any reimbursement of these costs from respondent or anyone else.
[8] The board refused to credit respondent with other penalties or sanctions, as the consent judgment to repay $150,000 to the Sweeney & Miller firm was an attempt to make the law firm whole for what respondent converted; it was not punitive in nature. Moreover, the board refused to recognize in mitigation any personal or emotional problems suffered by respondent. Respondent was hospitalized in June 2001 during his bankruptcy proceeding, at which point he expressed the thought that his family would be better off if he were dead. However, there was no testimony to support a causal connection between respondent's hospitalization and the conduct that forms the basis of the formal charges.
[9] In addition to these obligations, the board noted that respondent "remains bound to honor the bankruptcy court consent judgment."
[10] In brief and argument to this court, respondent asserted that he cannot be disbarred on a permanent basis because to do so would constitute an ex post facto law. He submits the sanction of permanent disbarment was not available at the time his interim suspension became effective on July 6, 2001. As such, respondent contends that he "entered into the penalty phase" before the amendments to Rule XIX were adopted, and any sanction imposed upon him must allow him to reapply for admission, as that right existed on the day of his interim suspension.

We see no merit whatsoever to this argument. It is well-settled law that the amendments to Supreme Court Rule XIX, § 10 and § 24 providing for permanent disbarment do not have an ex post facto effect on cases arising prior to the adoption. In re: Laudumiey & Mann, 03-0234 (La.6/27/03), 849 So.2d 515, cert. denied, 540 U.S. 1048, 124 S.Ct. 814, 157 L.Ed.2d 697 (2003). Likewise, we see nothing in our rules or jurisprudence which would support respondent's contention that his "right to be sanctioned" is fixed on the date he is placed on interim suspension.